### WOLOWITCH v. NATIONAL SURETY CO. OF NEW YORK.

(Supreme Court, Appellate Division, First Department. July 11, 1912.)

1. INSURANCE (§ 96*)—APPLICATION—WARRANTIES—ACTS OF BROKER.

Plaintiff in an action for burglary insurance warranted that he had no burglary insurance, and that he had never been refused any, and had applied for none other than as stated. The policy provided that it should be void if insured attempted in any way to defraud the company, that no agent had authority to change or waive any of its provisions, and that notice or knowledge to the agent or to any other person should not constitute a waiver or change any part of the contract. Plaintiff employed a broker to obtain the insurance, and he, after applying to one or more companies and being refused, obtained a policy from defendant, so that, while plaintiff's warranty that he had not applied and been refused was true when made, it was false at the time of defendant's issuance of the policy, though plaintiff had no knowledge thereof. *Held*,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that the broker was plaintiff's agent, and, the defendant having issued the policy relying on the warranty, plaintiff was bound by his acts.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 126; Dec. Dig. § 96.*]

2. INSURANCE (§ 335*)—BURGLARY INSURANCE—BOOKS OF ACCOUNT.

A provision in a burglary policy that the insurer should not be liable if insured's books of account were not so kept that the actual loss might be accurately determined therefrom was a material provision of the policy, and it was therefore error for the court to charge that if the jury believed that a burglary occurred as claimed, but they were unable to determine from the books of account kept by plaintiff the amount of the loss, the verdict must be for defendant.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 853; Dec. Dig. § 335.*]

Appeal from Appellate Term.

Action by Bernard Wolowitch against the National Surety Company of New York. From a determination of the Appellate Term affirming a judgment of the City Court on a verdict for plaintiff, and from an order denying a motion for a new trial, defendant appeals. Reversed.

See, also, 134 N. Y. Supp. 1150.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, MILLER, and DOWLING, JJ.

Joseph L. Prager, of New York City, for appellant.
J. Sidney Bernstein, of New York City, for respondent.

CLARKE, J. This is an action on a burglary insurance policy. The policy provided that "in consideration of $24 premium, and of the statement in the schedule hereinafter contained, which statements the assured makes on the acceptance of this policy and warrants to be true," the company assured the plaintiff in the total sum of $1,000 for the term of 12 months beginning on the 28th day of March, 1910, at noon, and ending on the 28th day of March, 1911, at noon, "subject to the hereinafter special and general agreements, terms, and conditions which are to be construed as co-ordinate conditions and precedent to any recovery under this policy, for direct loss by burglary of any of the merchandise described in the schedule hereinafter contained."

[1]. Under "Special Agreements," it was provided:

"(A) The company shall not be liable. * * * (4) If the books and accounts of the assured are not so kept that the actual loss may be accurately determined therefrom."

In the schedule it was provided:

"(9) The assured has no burglary insurance, has never been refused any, and has applied for none other than is herein stated.".

Under "General Agreements," it was provided:

"(5) This policy shall be void and thereupon cease and determine *. * * if the assured attempts in any way to defraud the company. * * *. (10) No agent has authority to change this policy or waive any of its provisions, nor shall any notice to the agent or knowledge of his or any other person be

*For other cases, see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

held to effect a waiver or change in this contract or in any part of it
* * * and no change whatever in this policy or waiver of any of its pro-
visions shall be valid unless an indorsement is added thereto, executed in the
same manner [in writing and signed by an executive officer]."

The answer as a first defense alleged:

"That at and about the time of the said alleged loss the plaintiff failed
and neglected to keep proper and complete books and accounts. * * *
That at and about the time of the said alleged loss the books and accounts
of the plaintiff, if he be the insured under said policy, were not so kept that
any actual loss which may have occurred under the said policy of insurance
could be determined therefrom."

For a second defense:

"That previous to the issuance of the policy under which plaintiff claims
plaintiff had applied for and been refused burglary insurance by other in-
surance companies. * * * That the warranty contained in the said policy
of insurance made by the assured upon the acceptance of the said policy
'that the plaintiff had never been refused burglary insurance, and had never
applied for any other,' was and is untrue, and that by reason thereof there
was a breach of the warranty in said policy with respect to previous ap-
plications for insurance, and the policy was at the time of the said loss, and
now is, null and void."

It also alleges for a fourth defense that he has greatly exaggerated
and overstated the value and amount of any loss which he may have
sustained, and said overstatement was made for the purpose of cheat-
ing and defrauding the defendant; that by reason of the aforestated
attempted fraud said policy was and is null and void, and the plain-
tiff is precluded from any recovery thereunder.

The proof of the burglary was sufficient. The important questions
for consideration are: First. Was error committed in the refusal to
receive evidence tending to show a breach of warranty in regard to
previous application and refusal of other burglary insurance? Sec-
ond. Did the plaintiff keep proper and complete books and accounts
so that the actual loss could be determined therefrom?

First. The plaintiff's wife prior to his marriage to her, which took
place on December 21, 1909, had been engaged for some time in the
feather business in this little store on Seventh avenue. They both
testified that in January she took an inventory of the stock amount-
ing to $1,125 on January 10, 1910, and turned over the business to
him without a written assignment, and that it was thereafter con-
ducted in his name, she remaining as practical manager. Plaintiff tes-
tified:

"I instructed a young man by the name of Meyer Feltman to get me in-
surance, burglary insurance, which he did. He was the only one I told to
get a policy for me. He brought me this policy. * * * Told him to get
the policy in the beginning of January, right after I took over the business.
He only brought me one policy, and that is this one. I don't know what he
was doing between January and March 28th when I told him to get this
policy. Exhibit 1 was the first policy I got. I saw him very seldom during
that time.

"Q. When you saw him what did he say about the policy? [That was
objected to and sustained as immaterial, and defendant excepted.] I told
him to get a good company. I left that to him. I don't know where he ap-
plied or what company he applied to for insurance. I got the policy on
March 28th."

The burglary occurred the night of April 1st–2d.

Feltman was called by the defendant, and testified:

"My business is the insurance brokerage line. * * * I remember Mr. Wolowitch asking me to take out a policy of burglary insurance. That was the early part of March, 1910, or it may have been the latter part of February, or it might have been in January; when Mr. Wolowitch started in business. * * * I don't know exactly when he started in in Seventh avenue. It was at the time I approached him to take out a policy. He ·did not tell me what company to get the policy in. I was to procure for him a policy of burglary insurance. He told me what amount. I finally brought this policy to him from the National Surety Company. I applied for this policy in his behalf, not myself.

"Q. Now, what other companies did you apply to before you applied to the National Surety Company? (This was objected to and sustained.) I asked Mr. Wolowitch whether he carried any burglary policy, and he said no. I told him he ought to carry some burglary insurance. After a little discussion, he said he will take a policy from me to the amount of $1,000.

"Q. Did he tell you to apply for the policy from one of the companies? A. He said to go right ahead and get the policy; then I applied for such insurance.

"Q. Where did you apply? (Objected to and sustained.) I applied for insurance right after I got Mr. Wolowitch's orders. * * * We were talking on the burglary insurance business. He said, 'You can go ahead and get a policy.'

"Q. Did he tell you how much insurance? A. $1,000. He did not tell me any particular company to apply to. I didn't talk to him.

"Q. Didn't you meet him from the time he gave you the order to get him the insurance until the time you delivered him the policy? A. When I delivered the National Surety Company Policy; yes, sir.

"Q. Did you tell him anything at that time about having made any previous applications? (Objected to and sustained.)

"Q. Did you make any application to or did you apply for insurance to any other company in the city of New York asking for burglary insurance, besides the application you made to the defendant company, at or about the time that Mr. Wolowitch requested you to apply for insurance prior to the making of the application to the National Surety Company? (Objected to and sustained.)

"The Court: * * * Did you prior to that time after Mr. Wolowitch requested the protection make any previous application to any other company which had been rejected?

"The Witness: Yes sir.

"The Court: Prior to that time?

"The Witness: Prior to the National Surety Company application.

"The Court: Did you communicate that to Mr. Wolowitch?

"The Witness: No, sir.

"Plaintiff's Counsel: I move to strike it out.

"The Court: Strike it out. (Exception.)"

A number of other questions bearing upon the subject were ruled out. Employés from several other companies were put upon the stand, and questions were propounded as to an application for Wolowitch being presented to their companies. They were not permitted to testify.

"The Court: I will not permit this evidence, so you need not call any more witnesses on that point; the warranty of which are a part of the policy, unless it be shown that Mr. Wolowitch was acquainted with the fact that other policies had been applied for. I will not presume that the mere fact of the agency for special purposes is sufficient to charge the principal with knowledge thereof; the warranty being something that he personally testified he had no knowledge of. * * *

"Defendant's Counsel: Then I understand your honor will not permit me to offer any evidence except—

"The Court: No evidence except a direct indication which would warrant me in believing that Mr. Wolowitch had knowledge of the rejection.

"Defendant's Counsel: So as to have the record clear, I offer to prove that application was made to other companies by Mr. Feltman, who was authorized by Mr. Wolowitch to place insurance, and that those other companies had refused to issue policies.

"Plaintiff's Counsel: I object to the offer on the ground that it is incompetent, irrelevant and immaterial.

"The Court: Objection sustained. The matter will not be admitted. The jury will disregard the offer. (Exception.)"

If this ruling was error, it was fatal.

In the First National Bank of Ballston Spa v. Insurance Co. of N. A., 50 N. Y. 45, the survey contained the following question and answer:

"27. Watchmen. Is one kept in the mill or on the premises during the night and at all times when the mill is not in operation, or when the workmen are not present? A. Yes."

On the day previous to the destruction of the property by fire, the personal property in the mill was levied upon by the sheriff upon an execution against the assured. The sheriff excluded the employés from the mill, took the keys, and locked up the building. The deputy sheriff and one of the trustees of the assured remained in the office of the mill, about two rods from it, during the night up to the time of the discovery of the fire which occurred about 4 a. m., but they did not watch. Grover, J.:

"Where a fire policy refers to a survey and declares that it shall constitute a part of the policy, the statements therein contained in regard to the situation, use, and care of the property are to be regarded and construed as warranties. * * * Failure to comply with a warranty will bar a recovery in case of loss, whether the loss was caused by such failure or not. * * * This statement (referring to the question and answer quoted above) was promissory, but the rights and duties of the parties were the same under it as though it had been affirmative. * * * It appearing that there was a breach of the warranty to keep a watchman, the nonsuit was properly granted, and the judgment must be affirmed."

In Baker v. Home Life Ins. Co., 64 N. Y. 648, the action was upon a policy of life insurance. The defense was breach of warranty. By the terms of the policy the statements in the application were made warranties. Among other questions was the following:

"Have the parents, aunts, brothers, or sisters of the party insured, been afflicted with insanity, consumption, or with any pulmonary, scrofulous, or other constitutional disease? A. No."

In answer to another question as to what disease a deceased brother died of the answer was, "Unknown." Plaintiff proved on the trial that the answers were taken down by the agent of the company, who filled out the application, that the insured stated to the agent that she understood that said brother died of consumption, and that the agent stated that where she had no knowledge to answer, "No; none." The evidence established that the mother, one or more of the brothers, and one or more of the sisters of the insured had been afflicted with consumption, and with pulmonary and scrofulous diseases, and had died from their effects. The court nonsuited the plaintiff. Held, no error;

that the facts established, whether known to the applicant or not, at the time of the application, avoided the policy; that, if the brother named had been the only one of the family who had been thus afflicted, there might have been a question, for the jury whether the fact was not communicated to defendant's agent, in the answer to the subsequent question, in a way to qualify the direct negative, but that the explanation as to his death, did not cover the vice of warranty as to the other relatives named. The court reiterated the rule that the policy having been issued upon the condition that, if the statements should be found untrue, the policy would be void, the untruthfulness of such statements avoided the policy, and it was immaterial whether they were made in ignorance or fraudulently—citing 50 N. Y. 45, supra.

In Allen v. German American Ins. Co., 123 N. Y. 6, 25 N. E. 952, Gray, J., said:

"In this particular case it was found that the plaintiff did not know about the limitation as to the other insurance. But that is his fault, and not that of the company. It had the right to presume that the plaintiff knew of and assented to every provision in its policy, when he accepted it. Nor is it of any consequence that it may not be possible to show that any prejudice could accrue from insurance in excess of the particular amount. The purpose of inserting a warranty by the assured is wholly immaterial to the question. Parties may insert any provisions they choose in contracts, provided they violate none of the rules of law, and they should all be given their appropriate and intended effect. The warranty inserted here was that the policy should be void, if the assured should thereafter obtain other insurance on the property in excess of a certain stated sum. The assent of the plaintiff to this provision is conclusively presumed from his acceptance of the policy. In this respect he voluntarily fettered himself and submitted to the defendant's conditional acceptance of the risks proposed."

On the question whether the insurance broker was the agent of the company so that his knowledge of other insurance at the time of the delivery of the policy constituted a waiver, the court said:

"There is nothing in the case to show that Noble was authorized by defendant to act as its agent to effect insurance, or to accept risks on it. So far as it appears, Noble had no relations whatever with the defendant, other than that he forwarded this paper writing, which contained statements of the amount of insurance proposed for, and of the privileges desired. He certainly appears to have been nothing more than an insurance broker, soliciting insurance business, and when, upon the acceptance of the risk, he received back a policy of the company for the plaintiff, his sole office was simply to deliver it for the company, and to collect the premium. That is certainly not enough to constitute him an agent for the company, with authority to bind it retroactively, or presently, in transactions relating to insurance. * * * A mere insurance broker, as Noble appears to have been, cannot be converted into an agent of the insurance company, without evidence of some action on the part of the company, or of facts, from which a general authority to represent it might be fairly inferred."

In Fletcher v. Bankers' Life Ins. Co., 135 App. Div. 295, 119 N. Y. Supp. 801, the insured answered the question, "Have you ever made an application for life insurance on which a policy was not issued, or if issued on a different plan than the one applied for?" "No." It appeared that at the time of the application for the policy in suit he had made an application to another company, and that policy had not been issued. The evidence was not clear that he had been informed

that he had been rejected. Mr. Justice Ingraham assumed that he had merely been informed "that he was postponed for a further examination. Assuming that he was so told on the 21st of July, the deceased knew at the time he was examined that he had made an application * * * for life insurance, and that a policy had not been issued. His answer, therefore, to that question was clearly false. This rejection by another company was most material. It seems to me that this was a clear breach of the warranty."

It may seem hard to hold an applicant as upon a warranty of a statement which at the time he made it was true, and of the falsity of which at the time of the issuance of the policy he had no knowledge. But want of knowledge does not relieve against a warranty. It imputes absolute verity at the time that the policy is issued. It is on the faith thereof that the company acts. In this particular branch of insurance, embracing really a moral risk, this warranty is especially a material one. The insurance broker was clearly the agent of the plaintiff for the purpose of obtaining insurance from any company which he could. Acting for his principal, he was bound to disclose to defendant company the truth as he knew it as to this very material representation. I think that notwithstanding the fact that the plaintiff may have known nothing of these rejections, as the company issued its policy relying upon the truth of the warranty, based upon the application to it, presented by the plaintiff's agent, he was bound. His agent was fully and duly authorized to obtain insurance. Therefore his acts and conduct in the prosecution of the precise agency which he was authorized to conduct, the obtaining of the policy at bar, were plaintiff's. It follows that the refusal to admit the evidence of prior rejections was error requiring reversal.

[2] Second. The defendant asked the court to charge that:

"If the evidence indicates, and the jury believe, that a burglary occurred at the time mentioned, but they are unable to determine from the books of account kept by the plaintiff or those in his employ the amount of such loss, their verdict must be for the defendant. The Court: Refused, I will leave that as a question of fact for the jury to determine."

The policy provided that:

"The company shall not be liable if the books and accounts of the assured are not so kept that the actual loss may be accurately determined therefrom."

A separate defense was set up in the answer based upon this provision. It was a material provision of the contract.

In Pearlman v. Metropolitan Surety Co., 127 App. Div. 539, 111 N. Y. Supp. 882, after quoting a similar provision, the court said:

"The plaintiffs did produce some books, but the evidence respecting them, including that of one of the plaintiffs, was that it was impossible to tell from the books, as kept, that the goods on hand on any particular day could be accurately determined. As the proof stood there was not sufficient evidence to justify a verdict in plaintiff's favor."

So in the case at bar certain books were introduced in evidence, but it was strenuously contended that they were not so kept as to comply with the provisions of the policy, and that the actual loss of the

assured could not be accurately determined therefrom. It was error, therefore, to refuse to charge as requested.

It follows that the determination of the Appellate Term and the judgment and order of the City Court denying a new trial should be reversed and a new trial ordered, with costs and disbursements in all courts to the appellant to abide the event. All concur.